Garsh, E. Susan, J.
INTRODUCTION
Each of the plaintiffs has filed a products liability action against DePuy Spine, Inc. (“DePuy”) seeking to recover damages for injuries allegedly caused by the Charité artificial spinal disc manufactured by DePuy.[1], [2], [3] This matter is before the court on DePuy’s motions for summary judgment predicated upon the position that all of the plaintiffs’ state law claims are preempted by the Medical Device Amendments, 21 U.S.C. §§360c et seq. to the Food, Drug and Cosmetic Act, 21 U.S.C. §§301 et seq. For the reasons discussed below, DePuy’s motions for summary judgment are DENIED.
BACKGROUND
Viewed in the light most favorable to the plaintiffs as the non-moving parties, the undisputed facts revealed by the summary judgment record are as follows.
DePuy is the manufacturer of the Charité disc, an artificial intervertebral disc implanted in patients to replace a diseased or damaged intervertebral disc. The Charité disc is classified as a Class III medical device by the United States Food and Drug Administration (“FDA”) pursuant to the Medical Device Amendments, 21 U.S.C. §§360c et seq., to the Food, Drug and Cosmetic Act, 21 U.S.C. §§301 et seq. The first generation Charité disc was developed in the 1980s by professors at the Orthopaedic University Charité Hospital in Berlin, Germany. A German manufacturer, Waldemar Link GmbH & Co. (“Link”), began the lengthy process of bringing the Charité disc to market in the United States under the FDA’s regulatory oversight by submitting an Investigational Device Exemption (“IDE”) application to the FDA on December 2, 1999, to develop clinical data to support an application for Premarket Approval (“PMA”). Only through an FDA-approved IDE can a manufacturer conduct clinical testing on a Class III medical device in the United States. 21 Code Fed. Regs. §§812.1-812.150. Link’s IDE application consisted of more than one thousand pages, which included the Charité disc’s proposed design, an investigational plan for testing the device, the results of pre-clinical trials conducted abroad, specifics about the device’s manufacture and labeling, monitoring for the proposed trials, information about Independent Review Board and investigators who would oversee the investigation, and samples of informed consent forms for potential patients in the clinical trials. The plaintiffs vigorously dispute whether the IDE application accurately and fully disclosed material information from the pre-clinical trials and clinical studies.
On December 29, 1999, the FDA conditionally approved the IDE application, notifying Link that it needed to submit information correcting certain deficiencies. On October 5, 2000, Link submitted the last of its supplemental responses to correct the identified deficiencies. On October 30, 2000, the FDA issued final approval for the Charité disc IDE. Investigational testing of the disc then commenced at fifteen approved institutions. On December 11, 2000, an Institutional Review Board approved a “Consent Form for Research” regarding the Charité disc. The Consent Form advised prospective patients that they had been selected to participate in the study because they had been suffering from lower back pain related to a disc in their back. The Consent Form further advised patients that they would be randomly assigned to receive either the “investigational” Charité disc implant or the FDA-approved spinal fusion BAK Cage, and that they could withdraw from the study at any time without penalty. The Consent Form stated that the Charité disc might not be of any benefit and set forth possible risks associated with the study, also noting that there were risks that could not be predicted and such risks might be unpredictable in both nature and severity.
Near the end of the IDE testing, Link submitted a PMA application to the FDA to obtain authorization to market the Charité disc in the United States. Link submitted Module 1, covering bench testing, on March 12, 2003. Link submitted Module 2, covering manufacturing processes, on April 17, 2003. On June 3, 2003, DePuy acquired all product rights to the Charité disc, including Link’s submissions to the FDA, and rewrote and resubmitted Module 2.
On February 13, 2004, following four years of clinical study in the United States, DePuy filed the final module to its PMA application, covering clinical studies, safety and effectiveness data, bibliography, and proposed labeling. DePuy’s complete PMA application consisted of more than 7,000 pages and included descriptions of the design of the device; technical drawings; manufacturing processes and procedures for the device; quality control procedures; and analysis of data from clinical studies. The PMA application also included a draft package insert to accompany the device after sale and to be available to the implanting surgeon. The draft package insert contained a description of the Charité disc; indications for use, precautions, information on adverse events, warnings, and contraindications; data from the clinical studies and device retrieval; and instructions concerning the proper placement of the disc during surgery, correct and stable joining of the device components, correct selection of proper implant size, and proper care of the device prior to implantation. The draft package insert also provided warnings and precautions related to the performance of the surgical procedure with regard to the risks of serious hemorrhage and neurological damage. The plain tiffs vigorously dispute whether DePuy’s PMA application satisfied FDA regulations and whether it fully and accurately described all material information concerning the Charité disc. On March 29, 2004, the FDA accepted DePuy’s PMA application for filing after determining that it was sufficiently complete to permit substantive review.
*427 The FDA began a lengthy scientific review of DePuy’s PMA application, assigning a biomechanical engineer as lead reviewer, to be assisted by an orthopedic surgeon and statisticians from the Officer of Science and Technology. Their work was further reviewed by FDA’s Deputy Division Director, who is a mechanical engineer; the Division Director, who is a doctor; and the Director of the Office of Device Evaluation, a Ph.D. As part of the FDA review process, DePuy had numerous exchanges of correspondence with the FDA, including matters such as requests for additional information, supplemental data analyses, and updates of clinical information. Again, the plaintiffs vigorously dispute whether DePuy accurately, completely, and candidly responded to FDA requests for information. FDA then utilized an advisory panel of independent medical, scientific, and engineering experts to study DePuy’s PMA application. The FDA advisory panel held an extensive public hearing on the Charité disc PMA application, which included discussion on the disc’s clinical history in Europe and issues such as efficacy, durability, post-operative range of motion, and side effects. The advisory panel voted to recommend the PMA be approved with conditions.
The FDA then required DePuy to update the IDE clinical data submission based on all patients seen between the database closure date of January 2004 and August 2004. The plaintiffs dispute that DePuy completely and accurately updated this data. The FDA instructed DePuy on certain conditions of approval, including reviewing the content of an FDA-required surgeon training program and finalizing the requirements of a post-approval study to collect long-term safety and effectiveness data. With respect to product labeling, DePuy prepared a draft text for the package insert, surgical technique brochure, and patient information brochure. The FDA required changes in the wording, content, and format of all three, which DePuy made, and the FDA then approved the text of each component of the Charité disc’s final labeling. The FDA conducted multi-day plant inspections at each of DePuy’s contract manufacturing facilities in the United States and Germany in the summer of 2004 and again in 2005. The FDA found DePuy’s manufacturing facilities to be in compliance with the Quality System Regulation, 21 Code Fed. Regs. §§820.1-820.250.
On October 26, 2004, the FDA’s Office of Device Evaluation in the Center for Devices and Radiological Health provided notice of approval of DePuy’s PMA application. The Notice of Approval states that the sale, distribution, and use of the Charité disc are restricted to prescription use in accordance with 21 Code Fed. Regs. §801.109. The Notice of Approval also imposes certain post-approval conditions on DePuy, including a post-approval study to collect long-term safely and effectiveness data. The Notice of Approval requires DePuy to submit annual reports with data obtained from all subjects enrolled in the post-approval study, and it requires DePuy to retrieve implants, when possible, for failure analysis of any patient implant that fails or is removed. The Notice of Approval states:
CDRH does not evaluate information related to contract liability warranties, however you should be aware that any such warranty statements must be truthful, accurate, and not misleading, and must be consistent with applicable Federal and State laws.
The Notice of Approval also states: “[FJailure to comply with the conditions of approval invalidates this approval order. Commercial distribution of a device that is not in compliance with these conditions is a violation of the act.” The Notice of Approval requires ongoing compliance with certain general “Conditions of Approval” based on FDA regulations governing medical device safely, including PMA supplements under 21 Code Fed. Regs. §814.39, post-approval reports under 21 Code Fed. Regs. §814.84, adverse reaction and device defect reporting under21 CodeFed. Regs. §814.82, and adverse event reporting under 21 Code Fed. Regs. §803.
The FDA issued a document entitled “Summary of Safety and Effectiveness Data for the Charité disc” (“the Summary”) that outlines indications for use, contraindications, warnings and precautions, device description, alternative practices and procedures, marketing history, and potential adverse effects of the device on health. The Summary contains the following device description:
The CHARITÉ Artificial Disc is a weight-bearing modular implant consisting of two endplates and one sliding core. Endplates are manufactured from cobalt-chromium alloy and are available in various sizes and degrees of angulation (parallel and oblique). A parallel and an oblique endplate of the same size can be combined for adaptation to the patient’s lumbar lordosis. The sliding cores are manufactured from ultra-high molecular weight polyethylene (UHMWPE) with a radiopaque cobalt-chromium alloy wire for x-ray visualization. The sliding cores are available in various thicknesses with sizing consistent with endplate sizing.
The Summary then sets forth a table of available dimensions and angles for the Charité endplates and a table of available dimensions and angles for the Charité core. The Summary contains abstracts of the pre-clinical studies and clinical studies, and draws the following conclusion from those studies: *428 Finally, the Summaiy discusses the advisory panel’s recommendation and the October 26, 2004 FDA approval order.
*427 The valid scientific evidence presented in the preceding sections demonstrates that the CHARITÉ Artificial Disc is safe and effective in the treatment of DDD at one level in the L4-S1 region of the lumbar spine; and the device is non-inferior when comparing Overall Success rates to the control in treatment of DDD at one level (L4-S1).
*428 Since approving the Charité disc for sale in the United States, the FDA has conducted repeat audits of DePuy’s German manufacturing facility, reviewed DePuy’s annual reports, and approved changes in surgeon instruments and minor changes in manufacturing processes. The FDA has not pursued any regulatory or enforcement action against DePuy for non-compliance with the Charité disc PMA.
Plaintiff Allyson Fried-Cain (“Fried-Cain”) and her spouse, William Charles Hunter Cain, are residents of California. On September 5, 2001, during the IDE investigational study of the Charité disc, Dr. John Regan implanted the Charité disc between the L5 and SI vertebral bodies in Fried-Cain’s spine at the Cedars-Sinai Medical Center in Los Angeles, California. Fried-Cain disputes whether she signed a Consent Form prior to the surgery and whether such a form was effective and binding. Following the surgery, Fried-Cain experienced increased lower back pain and bilateral leg pain, and has incurred medical expenses and lost wages. On March 6, 2002, Dr. Todd Lanman fused Fried-Cain’s spine at the L5-S1 level, which has not relieved her symptoms.
Dr. Charles Rosen (“Dr. Rosen”), a spinal surgeon who practices and teaches at the University of California, Irvine, Medical Center, reviewed Fried-Cain’s medical records, radiologic studies, and other records. Dr. Rosen opines that the superior portion of the posterior end plate of the Charité disc in Fried-Cain’s spine has subsided into the L5 vertebral body. Subsidence is the fracture of the vertebrae by the metal endplate that causes it to sink into the middle of the vertebrae. This fracturing of the vertebrae also results in the abnormal oblique orientation of the metal plate, resulting in abnormal loading of the facet joints, which are key in keeping the spinal column stable. Dr. Rosen opines that the Charité disc has caused abnormal loading of the facet joint at L5-S1 in Fried-Cain’s spine, which will more likely than not cause degenerative changes. Dr. Rosen opines that Fried-Cain’s radiation of pain into her extremities and numbness are caused by the subsidence of the Charité disc and the overloading of the facet joints. Dr. Rosen opines that the Charité disc in Fried-Cain’s spine did not resist subsidence in the lumbar end plate, and does not allow range or type of motion similar to the natural spine but rather, caused excessive and abnormal loading in portions of the spine. Fried-Cain filed a complaint against DePuy on May 25, 2006 and an amended complaint on November 3, 2006. Fried-Cain’s amended complaint alleges breach of warranty in Count I, negligence in Count II, breach of express warranty in Count III, and loss of consortium in Count IV.
Plaintiff David Brown (“Brown”) is a resident of Colorado. On June 16, 2005, Dr. James Bee implanted the Charité disc between the L5 and SI vertebral bodies in Brown’s spine at the Penrose Community Hospital in Colorado Springs, Colorado. Following implantation, Brown has continued to suffer from severe and debilitating back and leg pain, problems walking, and new symptoms such as buttock and groin pain and numbness in the legs, and has incurred medical expenses and lost wages. On June 21, 2006, Brown’s spine was fused at the L5/S1 level, but this procedure did not improve his condition.
Dr. Rosen reviewed Brown’s medical records, radio-logic studies, and other records. Dr. Rosen opines that the posterior portion of the end plate of the Charité disc in Brown’s spine has subsided into the L5 vertebral body, fracturing the vertebrae and resulting in the abnormal oblique orientation of the metal plate. Dr. Rosen opines that the Charité disc has caused abnormal loading of the facet joint at L5-S1 in Brown’s spine, which will more likely than not cause degenerative changes. Dr. Rosen opines that Brown’s radiation of pain into his extremities and numbness are caused by the fracture of the L5 vertebrae that allowed subsidence of the disc into the L5 vertebral body and the oblique or abnormal alignment of the L5 plate. Dr. Rosen opines that the Charité disc in Brown’s spine did not resist subsidence in the lumbar endplate and does not allow range or type of motion similar to the natural spine but rather caused excessive and abnormal loading in portions of the spine. Brown filed a complaint against DePuy in Suffolk Superior Court. His case was transferred to Bristol Superior Court, and he filed an amended complaint on November 3, 2006. Brown’s amended complaint alleges breach of warranty in Count I, negligence in Count II, and breach of express warranty in Count III.
Plaintiff Richard Greenwood (“Greenwood”) and his wife Kristin are residents of Florida. On July 8, 2005, Dr. Antonio Castellvi implanted the Charité disc between the L5 and SI intervertebral bodies in Greenwood’s spine at the Tampa General Hospital in Tampa. Following the surgery, Greenwood experienced increased lower back pain and leg pain, numbness and tingling, and has incurred medical expenses and lost wages. On January 9, 2006, Dr. Castellvi performed a surgical fusion at the L5/S1 level of Greenwood’s spine. Greenwood filed a complaint against DePuy in Suffolk Superior Court. His case was later transferred to Bristol Superior Court, where he filed an amended complaint on November 3, 2006. Greenwood’s amended complaint alleges breach of warranty in Count I, negligence in Count II, breach of express warranty in Count III, and loss of consortium in Count IV.
Plaintiff Mary Anne Rogerio (“Rogerio”) and her husband Angel are residents of Illinois. On May 31, 2005 Dr. Avi Bernstein implanted a Charité disc between the L4-5 vertebral bodies in Rogerio’s spine at Lutheran General Hospital in Park Ridge, Illinois. Since the surgery, Rogerio has experienced an in *429 crease in severe, radiating and debilitating back and leg pain and has been largely unable to work or care for her young children. Rogerio takes several pain medications daily and has nerve root blocks every four weeks to help reduce the pain. On February 24, 2006, Dr. Mark Lorenz performed a spinal fusion on Rogerio at the implanted level of L4-5.
Dr. Rosen reviewed Rogerio’s medical records, radiologic studies, and other records. Dr. Rosen opines that the posterior portion of the superior end plate of the Charité disc in Rogerio’s spine has subsided into the L4 vertebral body and caused significant early degenerative changes in the facet joints. Dr. Rosen further opines that implantation of the disc has caused overloading and subluxation of the facet joints at the L4-5 level and the over distraction of the L4-5 disc space, resulting in significant low back pain and radiation of pain down the lower extremities. Dr. Rosen opines that the Charité disc in Rogerio’s spine did not resist subsidence in the lumbar end plate and does not allow range or type of motion similar to the natural spine but, rather, caused excessive and abnormal loading in portions of the spine. Rogerio filed a complaint against DePuy in Suffolk Superior Court. Her case was transferred to Bristol Superior Court, where she filed her amended complaint on November 3, 2006. Rogerio’s amended complaint alleges breach of warranty in Count I, negligence in Count II, breach of express warranty in Count III, and loss of consortium in Count IV.
The plaintiffs have submitted the affidavit of Suzanne Parisian, M.D., who was employed by the FDA’s Office of Health Affairs (“OHA”) from 1991 and 1993 and as FDA’s Chief Medical Officer at the Office of Device Evaluation (“ODE”) from 1993 through 1995. While at OHA, Dr. Parisian was responsible for post-marketing issues regarding orthopedic devices, including the mandatory and voluntary recall of both PMA and §510(k) approved devices. While working for ODE, Dr. Parisian’s responsibilities included review of PMA, IDE and §510(k) applications, review and analysis of clinical trials, design of post-marketing clinical studies, training of ODE clinical reviewers, quality assurance design, identification and resolution of safety and efficacy issues, and the provision of clinical support for FDA regulatory actions and hearings.
Dr. Parisian reviewed published and unpublished case reports involving the Charité disc; DePuy’s IDE submissions, PMA submissions, PMA Supplements, and the 2005 PMA Annual Report; DePuy and Link’s United States patents; DePuy’s communications to physicians and patients; and communications between DePuy and the FDA. In addition, Dr. Parisian conducted her own review of spinal arthroplasty and fusion medical literature, reviewed the FDA’s website, and examined available marketing materials for the Charité disc. Dr. Parisian opines that Link and DePuy, in violation of FDA regulations, did not provide complete and accurate information to the FDA during the IDE process. Specifically, Link and DePuy allegedly failed to disclose information associated with the Charité disc concerning overdistension, dislocation, migration, subsidence, new neurologic symptoms, onset of new pain, need for secondary surgeries and fusions, impact of the design on facet joints, and potential long-term complications. Dr. Parisian opines that Link and DePuy repeatedly attributed to physician error, rather than device design, poor outcomes including migration, subsidence, dislocation, and overdistension of the joint with possible facet injuries.
Dr. Parisian further opines that DePuy failed to provide complete, accurate, and timely information to the FDA during the PMA approval process, in violation of FDA regulations, with the result that the Charité disc has failed to perform as represented in the PMA application and as approved by the FDA for marketing. Dr. Parisian opines that DePuy knew from field experience and various studies that dislocation, subsidence, and disc migration were device-related problems that posed a risk of failure to restore anatomic disc height and resist subsidence. DePuy allegedly failed to notify the FDA that it had to modify earlier versions of the Charité disc sold in Europe because of safely and effectiveness concerns involving migration and subsidence. DePuy allegedly made numerous changes to the disc to address safety and effectiveness concerns without informing the FDA that the changes were undertaken for such reasons, instead attributing the changes to physician convenience. These changes included larger endplates, larger diameter core components, additional oblique endplate dimensions, and addition of a porous endplate coating. Finally, Dr. Parisian opines that DePuy violated FDA regulations by failing to provide adequate post-approval reporting because the 2005 PMA Annual Report fails to provide more than limited risk information and fails to provide a full bibliography or summary of reports of data about the Charité disc and similar devices. In addition, DePuy allegedly conducted and reported an inadequate and biased physician survey.
On March 2, 2006, the plaintiff in the lead case, Brown, filed extensive discovery requests. Before responding to those requests, DePuy filed this motion for summary judgment in all four cases on the ground that the plaintiffs’ state-law claims are preempted by the Medical Device Amendments, 21 U.S.C. §§360c et seq. to the Food, Drug and Cosmetic Act, 21 U.S.C. §§301 et seq. DePuy provided the plaintiffs with only the Charité disc PMA application, PMA supplements, the 2005 PMA Annual Report, and the 2006 PMA Annual Report. DePuy then moved to stay further discovery pending resolution of the summary judgment motion. In opposing summary judgment, counsel for the plaintiffs filed an affidavit, pursuant to Mass.R.Civ.P. 56(f), stating that plaintiffs require further discovery in order to determine the specific prob *430 lems with the Charité disc so that they can establish that, for purposes of preemption, any state requirement imposed by a favorable jury verdict would not conflict with the federal requirements imposed by the FDA. This Court declined to postpone resolution of the summary judgment motion on the basis of the Rule 56(f) affidavit, but ruled that, for purposes of the summary judgment motion, the court would assume that discovery would reveal admissible evidence to support the opinions set forth in Dr. Parisian’s affidavit.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Com, 390 Mass. 419, 422 (1983); Community Nat'l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
DePuy contends that all of the plaintiffs’ state law claims are preempted by the Medical Device Amendments, 21 U.S.C. §§360c et seq. (“MDA") to the Food, Drug and Cosmetic Act, 21 U.S.C. §§301 et seq. Congress passed the MDA in 1976 as a response to public concern about the safety of medical devices. Medtronic, Inc. v. Lohr, 518 U.S. 470, 476-77 (1996). The MDA classifies medical devices into three categories based on the risk they pose to the public. Id. Class III devices, such as the Charité disc, are those for which Class I or II controls are inadequate to provide reasonable assurance of safety and effectiveness and either present a potential unreasonable risk of illness or injury or are represented to be for a use in supporting or sustaining human life or for a use which is of substantial importance in preventing impairment of human health. 21 U.S.C. §360c(a)(C). Before a Class III device may be introduced to the market, the manufacturer must provide the FDA with “reasonable assurance,” through the “rigorous” PMA process, that the device is safe and effective. Medtronic, Inc. v. Lohr, 518 U.S. at 477. “Manufacturers must submit detailed information regarding the safety and efficacy of their devices, which the FDA then reviews, spending an average of 1,200 hours on each submission.” Id. Once the FDA has approved a medical device through the PMA process, the manufacturer is required to comply with the standards in the PMA approval order and generally cannot make changes that might affect the safely and effectiveness of the device without further FDA approval. 21 Code Fed. Regs. §814.39(a).[4]
The MDA contains an express exemption provision which provides in relevant part:
no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement -
(1) which is different from, or in addition to, any requirement applicable under this Act [21 USCS §§301 et seq.] to the device, and
(2) which relates to the safely or effectiveness of the device or to any other matter included in a requirement applicable to the device under this Act [21 USCS §§301 et seq.].
21 U.S.C. §360k(a).
Section 360k(a) establishes a two-part test for determining whether a common-law tort action with respect to a medical device is preempted by the MDA. First, the court must determine whether there are any device-specific federal requirements applicable to the device at issue. Riegel v. Medtronic, Inc., 451 F.3d 104, 116 (2d Cir. 2006). If so, the court must then examine carefully whether there would be a conflict between those device-specific federal requirements and any of the liability-creating premises of the plaintiffs state law claims. Id.
A. Federal Requirements
DePuy contends that the FDA’s approval of its PMA application imposes federal requirements on the Charité disc for purposes of §360k(a) preemption. The majority of courts to consider the issue after Medtronic, Inc. v. Lohr have concluded that FDA approval of a device through the PMA process imposes federal device-specific requirements.[5] This Court is persuaded by the reasoning of those courts and concludes that the PMA process results in the imposition of federal device-specific requirements.
As noted by the plaintiffs, the PMA Approval letter for the Charité disc, by itself, does not expressly impose device specific requirements because the “Conditions of Approval” incorporated in the approval letter are not specific to the Charité disc but rather reflect generic concerns applicable to all Class III devices. Cf. Lohr, 518 U.S. at 501 (discussing generality of federal labeling and good manufacturing practices requirements in context of §510(k) approval). The Conditions of Approval implement numerous FDA provisions by limiting advertising to approved labeling, requiring the manufacturer to submit a PMA Supplement before making changes affecting the safety or effectiveness of the device, requiring the manufacturer to submit post-approval reports, and requiring the manufacturer to report any incidents of adverse reaction to or known defect of the device. See 21 Code Fed. Regs. §§803 et seq., 814.39, 814.82, 814.84. The lack of specificity in the Approval Letter is not fatal because *431 the PMA approval letter represents FDA’s acceptance of all of the device-specific information contained in the sum of the PMA submissions. Although the FDA does not set forth with specificity the reasons for its approval, it has, by implication, relied on the entire PMA submission and any PMA supplements. Kemp v. Medtronic, Inc., 231 F.3d at 228 (holding that the information submitted to and approved by the FDA in the PMA and as modified by the PMA Supplement comprise the specific federal requirements applicable to the device). Cf. In re St. Jude Medical Inc. Silizone Heart Valves Products Liability Litigation, 2004 U.S. Dist. LEXIS 148 at *34 (D.Minn.) (court must examine PMA submissions to determine whether FDA has promulgated any ascertainable precondition to approval). Accordingly, the submissions that form the basis of the FDA’s approval of the Charité disc constitute device-specific federal requirements that relate to the safety or effectiveness of the Charité disc for purposes of preemption under §360k(a).
Prior to PMA approval, plaintiff Fried-Cain had the Charité disc implanted in her spine as part of the IDE experimental trials. Investigational devices are not subject to the rigorous PMA process, but they are subject to a different set of complex and comprehensive regulations that set forth detailed procedures for determining whether they are sufficiently safe to be used for investigational purposes. Martin v. Telectronics Pacing Systems, Inc., 105 F.3d 1090, 1095 (6th Cir. 1997), cert. den., 522 U.S. 1075 (1998). See 21 U.S.C. §360j(g); 21 Code Fed. Regs. §812.20, §812.25, §812.27. See also 21 Code Fed. Regs. §812.30(b) (FDA may disapprove IDE if there is reason to believe that risks to subjects are not outweighed by anticipated benefits to subjects and importance of knowledge to be gained). Because of their experimental nature, IDEs are exempted from certain FDA regulations, including those involving misbranding, pre-market approval, and good manufacturing practice requirements. See 21 Code Fed. Regs. §812.1. Although the FDA makes no determination that the design of an IDE device is safe and effective, the IDE regulations specify procedures for determining whether an experimental design has sufficient promise of being proved safe and effective to justify the risk of being used on human beings. Slater v. Optical Radiation Corp., 961 F.2d 1330, 1333 (7th Cir.), cert. den., 506 U.S. 917 (1992). Accordingly, most courts have concluded that IDE approval imposes federal device-specific requirements. Chambers v. Osteonics Corp., 109 F.3d 1243, 1248 (7th Cir. 1997); Martin v. Telectronics Pacing Systems, Inc., 105 F.3d at 1097; Blinn v. Smith & Nephew Richards, Inc., 55 F.Sup.2d 1353, 1359-60 (M.D.Fla. 1999); Chmielewski v. Stryker Sales Corp., 966 F.Sup. 839, 843 (D.Minn. 1997); Berish v. Richards Medical Co., 937 F.Sup. 181, 184-86 (N.D.N.Y. 1996). This Court agrees that the FDA’s approval of the IDE for the Charité disc imposes federal device-specific requirements with potential preemptive effect.
B. State Law Requirements
The next step in the §360k(a) preemption analysis is to determine whether the claims asserted by the plaintiffs would impose a state law requirement on a device that is different from, or in addition to, the federal requirements imposed through IDE or PMA approval. A jury verdict in a common-law action for damages may constitute a state “requirement” applicable to a device for purposes of preemption. Medtronic, Inc. v. Lohr, 518 U.S. at 487-88, 504-05 (Breyer, J., concurring); id. at 510 (O’Connor, J., concurring in part and dissenting in part); Lake v. TPLCD, 1 F.Sup.2d 84, 87-88 (D.Mass. 1998). This is the case because, for example, a jury award of substantial damages for the defective design of the Charité disc would, given the realities of manufacturing and commerce, have the same effect as a state statutory or regulatory requirement in forcing DePuy to change the design. See Riegel v. Medtronic, Inc., 451 F.3d at 122; Troutman v. Curtis, 143 P.3d 74, 86 (Kan.Ct.App. 2006). Cf. Bates v. Dow Agrosciences LLC, 544 U.S. 431, 445-46 (2005) (whether common-law actions for defective design, manufacture and testing of pesticide constitute “requirement” for purposes of FIFRA preemption provision depends on whether elements of those common-law actions impose rule of law with respect to labeling that must be obeyed, not speculation on whether jury verdict will prompt pesticide manufacturer to change label). The critical question is whether there is a conflict between the specific federal requirements applicable to the Chanté disc and any of the liability-creating premises of the plaintiffs’ articulated state law claims. Riegel v. Medtronic, Inc., 451 F.3d at 117. See also Martin v. Medtronic, Inc., 254 F.3d at 583 (court must focus on whether specific requirements imposed by common-law duties threaten to interfere with the FDA’s detailed PMA process).
1. Products Liability Claims
Count I of each plaintiffs Amended Complaint alleges that DePuy breached the implied warranty of merchantability because the Charité disc was in a defective condition which rendered it unreasonably dangerous and not suitable for the ordinary uses for which it was sold. Count II of each plaintiffs Amended Complaint asserts a claim for negligence and alleges that DePuy breached its duty to use reasonable care in the design, manufacture, and testing of the Charité disc; breached its duty to comply with FDA regulations; and breached its duty of reasonable care by manufacturing and assembling the disc in such a manner that it was prone to fail to operate as advertised and warranted.
A state law tort claim that alleges negligence or implied warranty liability notwithstanding a device’s compliance with PMA-approved standards will be preempted unless the duties that the claim implicates are equivalent to the FDA’s own device-specific requirements. Riegel v. Medtronic, Inc., 451 F.3d at 121-22 *432 (breach of implied warranty and negligent design, testing, marketing and sale claims preempted because they did not rest on the premise that the particular device used deviated from the standards contained in the approved PMA application but rather on the premise that the device itself was in some way defective and requires modification). See also Horn v. Thoratec Corp., 376 F.3d at 177-79 (common-law claims alleging defective design and manufacture and failure to warn preempted as to device not alleged to have in any way failed to conform with the FDA requirements prescribed by its PMA nor to have deviated from, or violated, any of the FDA’s federal statutes or regulations).
IDE approval also preempts state law claims for negligence, design defect, failure to warn, and breach of implied warranty whenever a jury verdict in favor of the plaintiffs would conflict with the FDA’s determination that a particular device may be distributed, subject to certain requirements, as part of a worthwhile experiment, despite the lack of a finding of safety or effectiveness. Chambers v. Osteonics Corp., 109 F.3d at 1248; Martin v. Telectronics Pacing Systems, Inc., 105 F.3d at 1099; Blinn v. Smith & Nephew Richards, Inc., 55 F.Sup.2d at 1360. State law claims, particularly those alleging design defect, have the potential to set up a direct collision with federal policy and undermine the purpose of the IDE exemption, namely to promote safe innovation by allowing experimental devices to be lawfully used for the purpose of conducting an investigation. Slater v. Optical Radiation Corp., 961 F.2d at 1333.
Thus, to the extent that the complaint could be read as alleging solely that the Charité disc is defective, unreasonable, or unsafe notwithstanding its adherence to the FDA standards upon which DePuy secured FDA approval, a jury verdict in the plaintiffs’ favor would impose a state requirement relating to safety or effectiveness that conflicts with the applicable federal device-specific requirements. Such a claim would be preempted under §360k(a).
The instant complaint, however, is not so circumscribed. The plaintiffs advance claims based on DePuy’s alleged departures from the standards set forth in the Charité disc’s approved IDE and PMA application, and there has not yet been sufficient discovery to conclude that the plaintiffs will be unable to support their allegations. State law claims that are based on a manufacturer’s failure to comply with the requirements imposed by the FDA are not preempted by the MDA because they would not impose different or additional requirements but rather would enforce the exact requirements imposed by federal law. Lohr v. Medtronic, Inc., 518 U.S. at 495 (§360k does not deny states the right to provide a damages remedy for violations of common-law duties that parallel federal requirements); Riegel v. Medtronic, Inc., 451 F.3d at 106; Mitchell v. Collagen Corp., 126 F.3d 902, 913, n.6 (7th Cir. 1997, cert. den., 523 U.S. 1020 (1998); Martin v. Telectronics Pacing Systems, Inc., 105 F.3d at 1101; Fry v. Allergan Medical Optics, 695 A.2d 511, 517 (R.I.), cert. den., 522 U.S. 952 (1997).
For example, the plaintiffs’ expert, Dr. Parisian, opines that DePuy’s IDE and PMA applications violated FDA regulations because Link and DePuy failed to disclose complete and accurate information about the Charité disc concerning overdistension, dislocation, migration, subsidence, new neurologic symptoms, onset of new pain, need for secondary surgeries and fusions, impact of the design on facet joints, and potential long-term complications. Dr. Parisian opines that DePuy knew from field experience and various studies that dislocation, subsidence, and disc migration were device-related problems that posed a risk of failure to restore anatomic disc height and resist subsidence. Dr. Parisian also opines that DePuy improperly failed to notify the FDA that it had to modify earlier versions of the Charité disc sold in Europe because of safety and effectiveness concerns involving migration and subsidence. DePuy allegedly made numerous changes to the disc to address safety and effectiveness concerns without informing the FDA that the changes were undertaken for such reason, instead attributing the changes to physician convenience. Such changes included larger endplates, larger diameter core components, additional oblique endplate dimensions, and addition of a porous endplate coating. Further, Dr. Parisian opines that DePuy has violated FDA regulations by failing to provide adequate post-approval reporting. According to Dr. Parisian, the 2005 PMA Annual Report fails to provide more than limited risk information, fails to provide a full bibliography or summary of reports of data about the Charité disc and similar devices, and contains information from a physician survey conducted by DePuy that was inadequate and biased.
“It defies logic, and flies in the face of Congress’s decision to impose a regime strictly regulating medical device manufacturers, to think Congress intended ... [that] once a medical device manufacturer obtains PMA approval, it would be insulated from liability even if it chose to conceal data from the FDA to maintain its PMA approval. Neither Lohr nor the FDA regulatory scheme can be stretched so far.” In re Medtronic, Inc. Implantable Defibrillators Litigation, 465 F.Sup.2d 886, 895 (D.Minn. 2006) (negligence, failure to warn, and strict liability claims not preempted where based on alleged violations of regulations governing disclosure of known risks and adverse events during PMA process and post-approval when manufacturer allegedly withheld critical information concerning premature failure of device battery).[6] This Court finds the reasoning in In re Medtronic, Inc. to be persuasive. While hardly settled law, there is additional authority for the proposition that state law claims premised on a manufacturer’s failure to comply with FDA reporting and disclosure obligations are not preempted because *433 they merely impose parallel requirements. Brooks v. Howmedica, Inc., 273 F.3d at 799 (suggesting that had plaintiff presented evidence to support a claim of failure to report known hazard to FDA, failure to warn claim might not have been preempted); In re St. Jude Medical, Inc. Silizone Heart Valves Products Liability Litigation, 2004 U.S. Dist. LEXIS 148 at *37 (negligence and defective design claims not preempted where they hinge on violations of FDA requirements such as failure to report known scientifically established risks); Green v. Dolsky, 685 A.2d 110, 117-18 (Pa. 1996), cert. den., 520 U.S. 1168 (1997) (negligence claims predicated upon failure to provide FDA with material data and known product risks and allowing device to be sold while knowing of its dangerous propensities are claims which mirror FDA requirements and are not preempted). Cf. Berish v. Richards Medical Co., 937 F.Sup. at 186 (to the extent that the plaintiff has alleged a claim that the defendant failed to comply with a federal regulation, such claim is not preempted by the MDA and may go forward).
There is no merit to DePuy’s argument that Buckman Co. v. Plaintiffs’ Legal Comm., 531 U.S. 341 (2001), forecloses a claim predicated upon failure to disclose material information to the FDA in violation of FDA regulations. DePuy contends that even if the plaintiffs claims based on non-disclosure are not expressly preempted by the MDA, Buckman requires this Court to hold that such a claim is essentially a “fraud on the FDA” claim that is impliedly preempted. In Buckman, the United States Supreme Court held that federal law impliedly preempted a state claim seeking to recover damages from a regulatory consultant who made fraudulent statements to the FDA in order to get §510(k) approval for a device. Id. at 348. The plaintiffs in Buckman did not claim that the device itself was defective; rather, they argued that “but for” the consultant’s fraud, the FDA would not have approved the §510(k) application; the device would not have been available on the market, and they would not have been injured. The Supreme Court reasoned that policing fraud against federal agencies is not a field that states traditionally have occupied, and the MDA amply empowers the FDA to punish and deter fraud in connection with medical devices. Id. at 348-49. The Court stated, “we have clear evidence that Congress intended that the MDA be enforced exclusively by the Federal Government.” Id. at 352. Finally, the Court noted that the plaintiffs in that case were not relying on any traditional state tort law for their recoveiy but, rather, were relying solely on the federal fraud enactments. Id. at 352-53.
A state claim alleging negligence based on failure to disclose known risks to the FDA and, thereafter, to patients is not impliedly preempted because liability does not exist solely by proof of a violation of FDA disclosure requirements. In re Medtronic, Inc. Implantable Defibrillators Litigation, 465 F.Sup.2d at 899-900. The “plaintiffs may use evidence — if they are able to produce it — of [DePuy’s] efforts to manipulate the regulatory process in order to prove their negligence . . . claims, but they may not bring an independent claim for relief based on fraud-on-the FDA.” Id. at 900. All of the plaintiffs’ claims are based on traditional state causes of action; plaintiffs do not seek recoveiy merely for a violation of federal law. The broad reading of Buckman urged by the defendant would eviscerate the principle articulated in Lohr and recognized in Buckman that state causes of action that parallel federal requirements are not preempted. Id. See also Dawson v. Ciba-Geigy Corp., USA, 145 F.Sup.2d 565, 573 (D.N.J. 2001) (under Buckman, traditional state law tort claims that parallel FDA requirements are not necessarily preempted as long as violation of FDA regulations is not a necessary element of claim). Cf. Desiano v. Warner-Lambert & Co., 467 F.3d 85, 93-96 (2d Cir 2006) (common-law claims brought pursuant to a state law waiving tort immunity if manufacturer withholds or misrepresents material information from the FDA not preempted by MDA because such claims are premised on traditional state law created duties and not on a newly-concocted duty between a manufacturer and a federal agency). See also Connelly v. Iolab Corp., 927 S.W.2d 848, 855 (Mo. 1996), cert. dismissed, 520 U.S. 1260 (1997) (common-law fraud claims not preempted by MDA because none of regulations governing IDE devices permit or require false or fraudulent statements and none prohibit truthful disclosure of information; thus, no conflict with specific federal requirements). But see Cupek v. Medtronic, Inc., 405 F.3d 421, 424 (6th Cir.), cert. den., 126 S.Ct. 420 (2005) (negligence per se claim alleging failure to comply with FDA conditions of approval is a disguised fraud-on-the-FDA claim impliedly preempted under Buckman); Baker v. St. Jude Medical, Inc., 178 S.W.3d 127, 138 (Ct.App.Tex. 2005) (fraud claim based on failure to follow FDA regulations concerning adverse effect reports impliedly preempted under Buckman).
In any event, there has not yet been any significant discovery. Where an underlying question of law is subject to doubt, the preferable practice is to decide the question on a full record of facts. Capazzoli v. Holzwasser, 397 Mass. 158, 165 (1986); Ritchie v. Department of State Police, 60 Mass.App.Ct. 655, 663 n.14 (2004).
Wholly apart from her opinions concerning failures by DePuy to disclose known risks to the FDA in violation of federal regulations, Dr. Parisian also opines that the Charité disc has failed to perform as represented to the FDA in the PMA application and as approved by the FDA for marketing. Dr. Parisian identifies performance or user-need requirements set forth in the PMA materials. In response to concerns raised by FDA, DePuy submitted a “Design Failure Mode and Effects Analysis” in the form of a table. With respect *434 to the implant assembly, the table lists the following “Part Functions”: “Must withstand mechanical axial forces and fatigue compression,” “Must withstand mechanical shear forces,” “Restore anatomic disc height and resist subsidence,” “Restore lordosis to lumber disc,” and “must restore normal ROM.” A table entitled “Design Input/Output/Verification/Validation,” lists the following user-need requirements under the column labeled “Performance”: “Implant must restore anatomic disc height,” “Implant must allow range of motion similar to natural spine,” “Must restore normal lumbar lordosis,” “Must resist subsidence in lumbar endplates,” “The implant must withstand the normal physiologic loading in the lumbar spine,” “Design must provide for initial fixation (resist expulsion of endplates and/or core during implantation),” and “Design must provide for long-term fixation (resist expulsion of endplates and/or core after implantation). The plaintiffs contend that the federal requirements imposed through the PMA process include such performance standards and that parallel claims based on failure to meet these standards are not preempted.
DePuy counters that PMA approval does not encompass enforceable performance requirements because the FDA approves only a device’s design, manufacturing, and marketing requirements. DePuy contends that the “performance requirements” identified by Dr. Parisian are in fact simply the medical objectives of the device which are “not an independent, parallel parameter capable of assessment apart from the evaluation of its design and manufacture.” Rather, argues DePuy, in approving the device, FDA concluded that the design of the Charité disc is sufficient to have a reasonable likelihood of meeting the identified performance objectives in a safe and effective manner.
The regulations governing the PMA process do, however, address performance issues. For example, a PMA application must contain a summary of the data and information in the application including a device description, defined as “[a]n explanation of how the device functions, the basic scientific concepts that form the basis for the device, and the significant physical and performance characteristics of the device.” 21 Code Fed. Regs. §814.20(b)(3)(ii). The PMA application must also contain a complete description of “[t]he properties of the device relevant to the diagnosis, cure, or mitigation of a disease or condition.” 21 Code Fed. Regs. §814.20(b)(4)(iii). Under the FDA’s Quality System Regulations, which apply to all devices, “design input” is defined as “the physical and performance requirements of a device that are used as a basis for device design,” 21 Code Fed. Regs. §820.3(f), and “quality” is defined as “the totality of features and characteristics that bear on the ability of a device to satisfy fitness-for-use, including safety and performance.” 21 Code Fed. Regs. §820.3(s). A PMA Supplement is required for a change which affects the safety and effectiveness of a device, including “(c)hanges in the performance or design specifications” of the device. 21 Code Fed. Regs. §814.39(a)(6). For purposes of device tracking, device failure is defined as “the failure of a device to perform or function as intended, including any deviations from the device’s performance specifications or intended use.” 21 Code Fed. Regs. §821.3(d). A supplement to an approved PMA “requests a significant change in design or performance of the device, or a new indication of use for the device, and for which substantial clinical data are necessary to provide a reasonable assurance of safety and effectiveness.” 21 U.S.C. §379i(4)(B).
DePuy’s PMA application makes repeated reference to certain fundamental characteristics of the Charité disc, including restoring anatomical disc height, allowing a range of motion similar to the natural spine, resisting subsidence, and withstanding the normal physiologic loading in the spine, all of which appear to be inextricably tied to the FDA’s conclusion that the medical benefits of the device outweigh any safeiy concerns. See 21 U.S.C. §360c(a)(2)(C) (safety and effectiveness of device are to be determined weighing any probable benefit to health from use of device against any probable risk of injury or illness from such use). DePuy’s PMA submissions, which are the source of the applicable federal device-specific requirements, include the “Design Failure Mode and Effects Analysis” table and the “Design Input/Output/Verification/Validation” table, which state that the implant “must” withstand mechanical axial forces and fatigue compression, restore anatomic disc height and resist subsidence, and restore lordosis to lumber disc and a normal range of motion. The term “must” imparts a mandatory requirement, rather than merely an aspirational goal. Accordingly, it is not unreasonable for the plaintiffs to maintain that the FDA promulgated as federal device-specific requirements for the Charité disc the user need requirements/performance measures identified by Dr. Parisian.
The notion that PMA approval encompasses such performance requirements is bolstered by the FDA’s labeling requirements. See, e.g., 21 U.S.C. §352(a) (device is misbranded if its labeling is false or misleading in any particular); 21 U.S.C. §360e(d)(2)(D) (Secretary shall deny PMA approval if proposed labeling is false or misleading in any particular). Here, for example, the FDA approved the labeling statement for the Charité disc that “Natural Motion is Back.” If the Charité disc fails to provide natural motion, this statement would be false and misleading, and the device would be misbranded.
DePuy undoubtedly is correct that FDA approval of a device does not impose performance requirements amounting to a guarantee of a certain medical result in every patient, such as resolution of pain and disability. At the same time, there appear to be certain performance requirements in the Charité disc PMA that are rudimentary features for a device intended to replace a natural vertebral disc, particularly where *435 DePuy, as part of its PMA application, represented to the FDA that its implant “must” perform certain functions in the user. Plaintiffs have provided the affidavits of two experts with extensive FDA experience, Dr. Parisian and Dr. Philip B. White,[7] both of whom opine that the PMA process imposes specific performance requirements on an approved device. Dr. White concurs with Dr. Parisian that DePuy’s PMA application includes performance requirements for the Charité disc that can be found in the March 2, 2004 Design/Input/Output/Verification/Validation table submitted by DePuy. There is evidence that the device does not perform in the manner which DePuy represented to the FDA that it must perform.
Based on language found in several cases, a strong argument can be made that a negligence action alleging failure to conform to the performance standards or requirements of the type identified by Dr. Parisian is not preempted under §360k(a) in the same way that a negligence action alleging failure to conform to physical requirements of a device is not preempted. “Approval by the FDA constitutes approval of the product’s design, testing, intended use, manufacturing methods, performance standards and labeling . . . [N]egligence claims must be considered preempted to the extent that they allege that [the manufacturer] was negligent despite its adherence to the standards required by the FDA in its PMA for this specific product.” Mitchell v. Collagen Corp., 126 F.3d at 913 (emphasis added). Accord McMullen v. Medtronic, Inc., 421 F.3d at 484; Kemp v. Medtronic, Inc., 231 F.3d at 226-27; Easterling v. Cardiac Pacemakers, Inc., 986 F.Sup. 366, 374 (E.D.La. 1997).[8] See also Hughes v. Cook, 452 F.Sup.2d 832, 841-42 (W.D. Tenn. 2006) (in case involving coronary stent in which balloon failed to deflate, court held that the PMA Supplement approval constituted FDA approval of the product’s “design, testing, intended use, manufacturing methods, performance standards and labeling” specific to the product, but found the tort claims to be preempted because no evidence was offered to support plaintiffs assertion that the FDA has specifically conditioned PMA Supplement approval on the device deflating every time it was used). Given the apparent absence of cases in which a plaintiff has sought to recover for negligent failure of a manufacturer to comply with performance requirements created as part of the PMA process, it is appropriate that the record be developed so that the theory being advanced by the plaintiffs may be explored in light of actual facts rather than a pleader’s suppositions. Capazzoli v. Holzwasser, 397 Mass. at 165; Ritchie v. Department of State Police, 60 Mass.App.Ct. at 663 n.14.
The Amended Complaints can also be read as alleging products liabiliiy claims based upon negligent manufacturing. Dr. Parisian’s opinion that the Charité discs on the market do not perform as represented to and approved by the FDA permit an inference that they are not being properly manufactured in accordance with the FDA-required specifications. The presence of such a claim is an independent basis to deny summary judgment on Counts I and II. A negligent manufacturing claim is not preempted to the extent that it rests on allegations that the particular device implanted in the plaintiff was not manufactured in accordance with the standards set forth in that device’s approved PMA application. Riegel v. Medtronic, Inc., 451 F.3d at 123; Chambers v. Osteonics Corp., 109 F.3d at 1248; In re Medtronic, Inc. Implantable Defibrillators Litigation, 465 F.Sup.2d at 897. A jury verdict in favor of the plaintiffs on a negligent manufacturing theory would not impose state requirements that differ from or add to the PMA-approved standards for the Charité disc, but would instead allow recovery for DePuy’s deviation from those standards, thus enforcing a parallel requirement. See Lohr, 518 U.S. at 495, 513 (O’Connor, J. concurring in part, dissenting in part).
In sum, IDE and PMA approval preempts only those state law claims that seek to substitute a jury’s judgment as to the reasonable safety and effectiveness of a device for the FDA’s reasoned decision in approving its development and distribution. The claims asserted in Counts I and II are not necessarily inconsistent with the federal device-specific requirements applicable to the Charité disc. Therefore, DePuy is not, at this time, entitled to entry of judgment in its favor with respect to those counts on preemption grounds.
2. Express Warranty Claim
Count III of each plaintiffs Amended Complaint asserts a claim for breach of express warranty and alleges that DePuy warranted, through statements made to sales representatives and physicians, and statements on the Internet, in package inserts, and in other communications intended for physicians, patients and the general public, that the Charité disc is safe, effective, and fit for its intended use. The complaints also allege that DePuy provided documentation to patients containing the following statements: “The CHARITÉ Artificial Disc has a clinical history spanning 17 years. Its safety, efficacy, and remarkable durability have been proven through thousands of implants worldwide,” and “Natural Motion is Back.” Under Massachusetts law, a buyer of goods may recover damages for a breach of any promise or affirmation of fact made by a seller of a product that becomes part of the basis of the bargain between the parties. G.L.c. 106, §2-313(1) (a). See also Anthony’s Pier Four v. Crandall Dry Dock Eng’r, Inc., 396 Mass. 818, 822 (1986) (claim for breach of express warranty is contract claim in which standard of performance is measured by the defendant’s promises).
Several courts have concluded that express warranty claims are not preempted because such claims arise from a voluntary contractual commitment undertaken by the manufacturer, rather than being imposed by the independent operation of state law. In *436 addition, to the extent that an express warranty claim is based on an FDA-approved statement, it seeks only to enforce a parallel requirement. See, e.g., Michael v. Shiley, Inc., 46 F.3d 1316, 1325-27 (3d Cir.), cert. den., 516 U.S. 815 (1995) (enforcement of statement on FDA-approved label involves voluntary commitment and in any event, amounts to parallel requirement); Mitchell v. Collagen Corp., 126 F.3d at 915 (express warranty claim arises from representations of the parties made basis of the bargain between them and does not necessarily interfere with operation of the PMA); Steele v. DePuy Orthopedics, Inc., 295 F.Sup.2d 439, 456 (D.N.J. 2003) (claim that device does not conform to statements in FDA-approved materials involves parallel requirement).[9] Cf. Cipollone v. Liggett Group, Inc., 505 U.S. 504, 525-26 (1992) (under Public Health Cigarette Smoking Act, breach of express warranty claim not preempted because “requirements” of such a claim are imposed by warrantor’s contractual commitment and not by state law). Moreover, through a Special PMA Supplement, DePuy may, without prior FDA approval, make labeling changes that delete false, misleading or unsupported indications. 21 Code Fed. Regs. §814.39(d)(2). This Court agrees with the view that claims for breach of an express warranty based upon words approved by the FDA are not preempted by the MDA.
The complaints at issue do not, however, purport to limit the express warranty claims to FDA-approved packaging, labeling or advertising materials. A claim of breach of express warranty based on voluntarily made representations is not preempted. In re Medtronic, Inc. Implantable Defibrillators Litigation, 465 F.Sup.2d at 898; In re St. Jude Medical, Inc. Silizone Heart Valves Products Liability Litigation, 2004 U.S. Dist. LEXIS 148 at *40-42. Cf. Bates v. Dow AgroSciences LLC, 544 U.S. 431, 444-45 (2005) (express warranty claim based on manufacturer’s oral representations not barred by FIFRA preemption provision concerning “labeling or packaging”).
Moreover, the FDA’s Notice of Approval for the Charité disc itself unequivocally states: “CDRH does not evaluate information related to contract liability warranties, however you should be aware that any such warranty statements must be truthful, accurate, and not misleading, and must be consistent with applicable Federal and State laws.” This assertion by the FDA in the Notice of Approval strengthens the argument that express warranty claims arise from a voluntary contractual commitment undertaken by the manufacturer and therefore neither conflict with nor are preempted by the MDA. Accordingly, DePuy is not entitled to summary judgment on plaintiffs’ express warranty claims.
ORDER
For the foregoing reasons, it is hereby ORDERED that DePuy’s motions for summary judgment in BRCV2006-00208, BRCV2006-00209, BRCV2006-00211 and BRCV2006-00630 be and hereby are DENIED.

Kristin Greenwood.

Angel Rogerio.

William Charles Hunter Cain.

The following changes may be made immediately by a manufacturer through a “Special PMA Supplement— Changes Being Effected” without prior FDA approval: labeling changes that add or strengthen a contraindication, warning, precaution or adverse reaction information; labeling changes that add or strengthen an instruction that is intended to enhance the safe use of the device; labeling changes that delete false, misleading or unsupported indications; and changes in quality control or manufacturing process that add a new specification or test method, or otherwise provide additional assurance of device purity, identity, strength or reliability. 21 Code Feds. Regs. §814.39(d)(2).

See, e.g., Reigel v. Medtronic, Inc., 451 F.3d at 118; McMullen v. Medtronic, Inc., 421 F.3d 482, 487-88 (7th Cir. 2005), cert den., 126 S.Ct. 1464 (2006); Horn v. Thoratec Corp., 376 F.3d 163, 170 (3d Cir. 2004); Brooks v. Howmedica, Inc., 273 F.3d 785, 795 (8th Cir. 2001), cert. den., 535 U.S. 1056 (2002); Martin v. Medtronic, Inc., 254 F.3d 573, 584-85 (5th Cir. 2001), cert. den., 534 U.S. 1078 (2002); Kemp v. Medtronic, Inc., 231 F.3d 216, 226-27 (6th Cir. 2000). But see Goodlin v. Medtronic, Inc., 167 F.3d 1367, 1375-77 (11th Cir. 1999) (concluding that PMA approval represents only general conclusion of safety and effectiveness and does not impose ascertainable substantive requirements on device); Haidak v. Collagen Corp., 67 F.Sup.2d 21, 23 (D.Mass. 1999) (PMA process itself does not impose specific federal requirements on device); Sowell v. Bausch & Lomb, Inc., 656 N.Y.S.2d 16, 20-21 (N.Y.App.Div. 1997) (same).

In that case, the coun. also raised the possibility that a manufacturer’s failure to disclose material information concerning safety and effectiveness may deprive it of federal preemption protection altogether. In re Medtronic, Inc. Implantable Defibrillators Litig., 465 F.Sup.2d at 900-01. See 21 U.S.C. §360e(e) (Secretaiy may withdraw approval of application if finds that application contained untrue statement of material fact); 21 Code Fed. Regs. §814.82(c) (failure to comply with any post-approval requirement is ground for withdrawal of approval of PMA). The FDA has not withdrawn PMA approval for the Charité disc.

Dr. White worked for the FDA for thirty years and was the Director of the FDA Office of Standards and Regulations, Center for Devices and Radiological Health from 1983 to 1994.

Each of these cases references performance standards as being approved by the FDA as part of the PMA process that ends up creating device-specific federal requirements as opposed to performance standards promulgated by the FDA under 21 U.S.C. §360d for specific devices. See 21 Code Fed. Regs. §861.20-§861.38. There are no performance standards promulgated by the FDA under 21 U.S.C. §360d applicable to the Charité disc.

But see King v. Collagen Corp., 983 F.2d at 1135 (express warranty claim based on an FDA-approved statement contained in a PMA is preempted by the MDA because it would conflict with the FDA’s rigid control over labeling and packaging by imposing different or additional requirements); Gomez v. St. Jude Medical Daig Division, Inc., 442 F.3d 919, 932 (5th Cir. 2006) (express warranty claim preempted where state statute governing warranty claim went beyond merely enforcing federal requirements).